Good morning, your honors. May it please the court. My name is attorney Christina Colon Williams and I represent the petitioner in this matter, Nelson Pinos Gonzalez. With me in the courtroom today are Nelson's two teenage daughters, Kelly and Arlie Pinos. Kelly and Arlie, would you please stand for the court? Thank you. Nelson Pinos was ordered deported without having access to an immigration hearing. He's literally never had his day in court. In fact, this morning represents the first time in 26 years that Nelson, through counsel, has been able to present himself before judges who are committed to taking a closer look at this case. This morning, Nelson is asking the court simply to grant him access to an immigration hearing. The court should overturn the board's decision for abuse of discretion, rescind the in absentia order against Nelson and reopen proceedings before the immigration court. Alternatively, at a minimum, the court should permit the immigration court to directly decide through an evidentiary hearing if necessary, whether reopening is appropriate in this case. The board abused its discretion because it confused the applicable procedure. Essentially, the board's decision treated this case as if it originated after 1997, when in fact it originated in 1994. And it does make a difference. The context of this case is critically important to the matters at hand, not just the nature of the proceeding at issue, but the timing of that proceeding. These are in absentia proceedings that are being appealed. Nelson was ordered deported in absentia at a hearing in 1994 that he did not attend as a consequence for his failure to appear. That hearing was the first and only hearing ever on that date was when? That date was March 10th, 1994. Now, this particular in absentia hearing took place at what was arguably the most confusing time in the history of US immigration law. 1994 proceedings were governed by the Immigration Act of 1990, which was in effect only for a limited five-year window between 1992 and 1997, right on the cusp of a major overhaul in US immigration policy. Now, the issuance of in absentia orders was expanding during this five-year period because of changes in the law that essentially made it an automatic response to the failure to appear at an immigration hearing to issue an in absentia order. And along with the expansion of in absentia orders, there was also this expansion of procedural protections, these mechanisms to protect against potential unfairness in these kinds of proceedings for non-appearance. And these protections are spelled out in the regulations. They provide this mechanism for bringing up any concerns about notice procedures in the context of in absentia proceedings. Because in in absentia proceedings, notice is everything. There's fundamental concerns about fairness at issue. If there's any risk or a chance that someone got ordered deported without a full opportunity to be present on that day. And this is why there's a unique process in place for this time period. A process that allows not only the filing, allows the filing of a notice-based motion to reopen to challenge an in absentia order. And these protections ensure that a motion challenging notice not only can be filed at any time, but if a first filing is unsuccessful, a non-citizen who is alleging that he was wrongly ordered deported in absentia can challenge notice through a second filing. This is this explicit number bar that the motion to, this kind of motion to reopen in this kind of proceeding is not number barred. Now this protection is no longer in place. In any proceedings after 1997, there is only one chance to challenge notice in in absentia proceedings. You get one motion to reopen, challenging notice, and that's it. But in 19- Was it, is it your argument that the notice was defective because he didn't receive it or because it wasn't adequately explained? Both. So essentially the notice argument here that Nelson is making is that the fundamental warnings that are supposed to be contained in the order to show cause, the initiating document, were never effectively communicated to Nelson, either in writing or orally. Well now counsel, we know it's in writing. Don't we have a copy of it? Gosh, 138 I think of the record. That's correct. So the copy, the the the order to show cause does, the physical complete copy of the order to show cause does include all of the required warnings. As required by law, it's in English and it's in Spanish. And it does include Nelson's signature. But according to Nelson's testimony and the case that he's presented before the board, is that he, on the day he was apprehended, there were tons of people apprehended that day. Um, and he was handed the signature page of the order to show cause and told to sign it. He signed that order, but no one on that day actually read the contents of the order to show cause to him in Spanish or English. No one explained to him the fact that he was in deportation proceedings. He was given a copy of it though, right? But he was not given a copy. He is contesting at this time that he was given at the time of leaving, leaving that day, um, a complete copy, any copy of the order to show cause, um, in the affidavit submitted to the board. It says he's supposed to carry it with him at all times. Correct. I mean, bold print. So you're saying that the, the agent lied or something, right? What we're saying is essentially that the, the government did take shortcuts in the procedure. That's what we're challenging is, is that the, the signature, the signature on the, on the last page does not accurately contain what happened. Um, so yes, essentially the agent says through presenting this document with the signature that the contents were read in English and Spanish. That's what it says on the signature page. That is not accurate. And we're also saying that, um, the personal service was effective, that that also is not accurate because he was not given a copy of the order to show cause on that day. What does the record show counsel about what your client was informed at the time of his arrest in 1993 about the consequences of not providing updated addresses? Right. So what the record does show, um, is that consistently from the moment Nelson has found out about this deportation order, um, and in the various filings that have been submitted, that Nelson has consistently testified that he did not know about the requirement to update or change his address with the immigration. I thought his attorneys had made different representations. So there are two filings at issue in this case, two motions to reopen based on there were three in the case. Tell me, yes, there are three filings that have been made, but two are at issue in the sense of challenging notice. Um, and the first filing Nelson did state in an affidavit that he never received any notice of the requirements to change address. And now since prior counsel also said he did not receive the fundamental warnings, um, about the nature of the proceedings and the responsibilities. Um, however, she does contradict herself in that filing and she, she essentially says he received a notice to appear, which, um, was not a legally recognized notice at that time. Um, so essentially these, these types of confusions in the record and the confusions in the story that Nelson has been able to tell in his first filing did prevent him, um, from fully expressing his this type of proceeding from this time period, Nelson was procedurally entitled to a second opportunity to articulate the concerns clearly and completely that he had about lack of notice in this case. Those concerns were fully presented to the board through the appropriate mechanism, a notice based motion to reopen. Um, in that motion to reopen, Nelson did clearly articulate that he never received the fundamental warnings about the nature of the proceedings. He was immigration court. That's why he never received the notice of hearing that was, that was properly sent by certified mail afterwards. Um, that, Oh, sorry. That did articulate, uh, sufficiently a lack of notice that warrants reopening in this kind of proceedings. The standard is not overly onerous or burdensome to reopen in absentia proceedings because of the concerns about fairness and this kind of proceeding on Nelson needed to do was clearly articulate a gap in the notice process that provided reasonable cause for his failure to appear in 1994. But it's still abuse of discretion in the end, right? That's correct. That's correct. That is, again, your argument that, right, that is the standard that the court should apply today. Um, but there was abuse of discretion in the board's decision and that's essentially because the board, um, did not apply those crucial procedural protections that do apply to in absentia cases from 1994. Counsel, does your argument depend upon the BIA's order not being an order, uh, reaching the merits? So essentially, yes. Essentially the BIA's order does accurately summarize Nelson's notice argument, but it does not evaluate it in any significant way. Um, the board does not find that the art, the grounds articulated by Nelson and his motion don't establish a notice sufficient for reopening. They don't make a finding on it at all. Um, they essentially say you said something in another filing that was different. Um, and so that was your, essentially they're saying you had that shot and, um, you lost that chance. So if you want another chance, you have to file a separate motion challenging ineffective assistance of counsel, undoing the work of that first filing before we can even hear your arguments on the second filing. Um, but that's not what the regulations provide. That's not the applicable procedure. It is now. Um, if he, if this case had originated in 2001 or 1998, that would have been an appropriate approach, um, to Nelson's filing. But this case didn't originate after 1997. It originated in 1994 and that does make a difference. Um, the board erred in one other fundamental way. Not only did it fail to address in any substantive manner the merits of Nelson's motion to reopen, it also didn't give a complete decision. Um, Nelson's motion to reopen was not only a motion to reopen. It was a motion to reopen and in the alternative, a motion for a limited remand. Um, Nelson specifically asked that if the board was inclined to deny his motion to reopen based on lack of notice, um, that he be given an opportunity to have his reopening request heard by an immigration court. The board of immigration appeals is an appeals body. It's set up to hear appeals of decisions by immigration judges. Um, it's not set up to find facts, determine what happened on a certain day. Was it story A or story B? That's not what the board is for. Do they have any fact finding ability? Some administrative agencies do. Um, those fact finding abilities are actually limited. So the board is, is not supposed to do fact finding in place of an immigration judge. Um, and that is clear from the board's own precedent. And so, um, it would not have been appropriate for the board in this case if the, if the board's concern really was Nelson's credibility, if they believed a story or not, um, the appropriate thing to do would not be to dismiss and fail to consider the substance of his arguments. It would have been to allow the immigration court, which is a fact finding body, which is set up to decide what really happened, um, which, and which is in fact the same immigration court that, um, the same body that issued the first ruling, um, to allow the immigration court to decide. That would have been the appropriate approach in this case. And that is specifically what Nelson was requesting. But the board didn't grant or deny Nelson's request. It was completely silent as to Nelson's request for a remand. For this reason, the board, the court today is not in a position to really to remand since the board said nothing. The board's decision was incomplete. For these two abuses of discretion, the wrong standard, um, and the incomplete decision, we are currently requesting that the case be remanded to the immigration judge for further proceedings. If there are no more questions, I'll reserve the rest of my time for rebuttal. Thank you, Good morning, your honors. May it please the court, my name is Julia Tyler and I represent the respondent, the attorney general in this case. Your honors, the board did not abuse its discretion in denying Mr. Pinos Gonzalez's third, effectively his fourth, but his, for all intents and purposes, his third motion to reopen his in absentia deportation order. Now, there's a claim that the board somehow improperly refused to consider the merits of this motion and simply discarded his motion because he had previously filed a motion to reopen alleging lack of notice. This is patently incorrect. We know this because the board directly acknowledged that a motion to reopen, claiming that an alien has failed to appear due to lack of notice, may be filed at any time. That is contained directly in the board's order. But in order to prevail on a motion to reopen an in absentia order in a deportation proceeding, and that is distinguished from an exclusion proceeding, and I'll get to that in a moment, the movement still must demonstrate that he or she did not receive notice of the hearing. And this is where the board found that Mr. Pinos Gonzalez fell short. The board I'm sorry, the board highlighted the fact that in his prior motion filed with the immigration court, he alleged that he had received the charging document, although it was referred to as a notice to appear by Ms. Torres. I would also like to make there's up there maybe some back and forth about whether or not it's important that it be called in order to show cause or a notice to appear. Post-Arrero we do call them notices to appear. Prior to Arrero we call them orders to show cause. Ms. Torres corrected that error in her motion for reconsideration to the immigration judge. She states again that Mr. Pinos Gonzalez received the order to show cause. And again, in the appeal to the board from denial of the motion for reconsideration before the immigration judge, she states unequivocally that Mr. Pinos Gonzalez received the order to show cause. So the board points out this difference in the narrative of whether or not he received the charging document and also states that he disputes the information in the order to show cause itself, that he received it and that the information was read to him in Spanish. Now, Judge Krantz, you asked a question about whether or not he was warned of the risks of not informing the immigration court about his moving. That is contained not only in his order to show cause, which he signed and stated previously that he received, and also in the conditions of his bond release, which is found at page 1142. Now, I know it's going to come up, and I think that counsel already alluded to it, but there is some contention in the reply brief, I see it repeatedly, that somehow Ms. Torres' claim that he received the order to show cause was patently inconsistent with Mr. Pinos Gonzalez's first affidavit. And she cast aspersions on Ms. Torres. In fact, in her reply brief, she calls this an outright misrepresentation with regard to whether Pinos Gonzalez received the order to show cause. And for that, counsel relies very heavily on a phrase in the very first affidavit that Mr. Pinos Gonzalez filed. And this is the record at page 711. The phrase is, they never told me or gave me any paper to change my address. Now, you judges know that context is everything. And if you read the entire sentence of that phrase, it says, I told the officials of my intention to move to New York, and they never gave me any paper to change my address. Now, it's clear that what he's referring to is a change of address form, which is what someone would be given if they told an immigration official, I'm going to move, theoretically. Is there such a form? I believe there is. Proceed. I believe there is. And then there's something else in this affidavit that is very key, because this is the aspect that makes it consistent with what Ms. Torres said in that first motion to reopen. He said, I never received any mail. I only received from the officials at the jail a letter in English. My friend told me it says a date would be coming for court, but he could not explain when or if it would be in New York. Now, he's in jail, so we know that this is not something that was mailed to him. He refers to it as a letter, but it's something that he's in jail at this point. The only document that Mr. Pinos Gonzalez ever received at the time he was incarcerated that states that a date would be coming from court is the order to show cause. Returning back to the standard here, what counsel is basically arguing is that his establishes reasonable cause that the board should have granted, and the board should have granted the motion accordingly. There's two problems with that argument. The first one is that reasonable cause is not the standard. Under the regulation at 8 CFR 1003.23B4, three little I's, big A, and a two, it clearly states that in deportation proceedings, if you want to reopen in an in absentia removal order, you must demonstrate that you didn't receive notice. Counsel repeatedly mentions reasonable cause. That is the standard associated with 1003.23B4, three little I's, B, states in a motion to reopen exclusion proceedings based on that the immigration judge improperly entered an order of exclusion, D'Alene must establish reasonable cause for his failure to appear. So we are not talking about reasonable cause here. We are talking about a demonstration that he did not receive notice. And secondly, what counsel wants this court to do is to order the board to simply put blinders on whenever anybody comes before the court, even if that argument is completely and 180 degrees different from what they argued before. But what mistake did he make during all of these years? The tenure of your brief is he had a lot of avenues of relief early on, but he spurned them when I got married and had children and thereafter got a job. He shouldn't complain now. And what do we make of the fact that he met in 2012 as an immigration judge and thereafter he was treated, go on, everything's going well. And self-report and all that, which he did. And then all of a sudden things change. I couldn't help thinking as I was reading this brief, the humanitarian aspects of it, if there is such a thing. I'm recalling Victor Huber, Hugo's Inspector Javert. Do you ever find yourself in that role? You're representing the government. It's a heartless group, of course. Well, Your Honor, I do want to say that the respondent is very sympathetic to the hardship being experienced here. His children, his partner. Your Honor, deportation is hard and the government understands... Getting harder, I think it's a fair thing to say. The government understands that deportation is hard. They're enforcing these laws with a vengeance that's never been seen before in this country. But Your Honor, I agree with you... I may be back to the Chinese exclusion, but beyond that... I would like to, in responding to your question, I would like to agree with you that Mr. Pinos Gonzalez, and by the way, I do not say any of this to criticize Mr. Pinos Gonzalez, but I do need to highlight... The law is the law. The regulations... When you're down to the third parents, I couldn't even follow you when you were reading the sub-parents of the regulation. I have trouble myself. I doubt that the Nelsons of the world understand them. Most of us judges don't. Well... Or some of us. To respond to... Present company excluded. To respond to your question, I agree that the record reflects that Mr. Pinos Gonzalez had many opportunities to correct the situation in which he finds himself. I will... And I want to highlight, if I may, I'll just highlight a few. Of course, and I will remain silent the perimeter of the argument. In his first affidavit, which I mentioned before, I believe it's at page 711. This is an affidavit he created in 2014. He noted that when he did not receive any more papers... This is an implicit concession that he did receive the order to show cause. When he did not receive any more papers, he did not try to find out what happened. And he admits in that affidavit at page 711, that back in 1993, when he didn't find out what happened, that that was wrong. At what point did he finally get counsel? Was it in 2012 or before that? I believe he checked in with an immigration attorney, yes, in 2012. But Judge Wollman, back in 1996, just three years after he had been ordered removed in absentia, he was informed that he was in deportation proceedings when his then wife filed an I-130 visa petition. And I've forgotten what happened to that. He didn't show for the interview. So his wife, his then wife, filed an I-130 visa petition on his behalf. And Legacy INS... Or something like that? Well, this happened later. They actually broke up, I think. I couldn't say. But we know that INS, then INS, informed Mrs. Gomez and Mr. Pinos Gonzalez that he was in deportation proceedings. Because actually, that profoundly impacts how an I-130 visa petition is adjudicated. So they asked Ms. Gomez and Mr. Pinos Gonzalez for information related to that deportation proceedings. Ms. Gomez replied to INS's inquiry. This is in the record at page 641. Acknowledged that Mr. Pinos Gonzalez had been in deportation proceedings and represented that Mr. Gonzalez had lost all of his papers. But what's important about this is that Mr. Pinos Gonzalez says, I didn't know anything about my deportation order until 2012. Well, maybe he didn't know about the actual order. But he also didn't take any steps to ascertain what happened in his deportation proceeding when he was told he was in deportation proceedings no later than 1996. Before he broke up with his wife. Before any... Before a great many things. He did not follow up with INS to find out what had happened in those deportation proceedings. And indeed, he didn't show for his visa interview on May 24th, 1999. And he didn't tell INS why he didn't show. He has an explanation for it. His wife and he broke up and there wasn't any point. The visa interview came along and there wasn't any point in going. But he also didn't tell the INS that. And then in 2012, he turns himself in. I think there's a representation in petitioner's brief that he was granted prosecutorial discretion. And that is not correct. There's nothing in the record that reflects he was granted prosecutorial discretion. Again, what was not in the record? What is not in the record? That he was granted prosecutorial discretion. He turned himself in in 2012 and he was put on an order of supervision. Which is how DHS proceeds to remove people. They get their information and they discuss their priorities. And then they make a decision as to who... Is it incorrect to say that ICE officials exercise their prosecutorial discretion not to deport him? Or how did they phrase it? How did they put it in bureaucratic speak? They put him on an order of supervision. That's really what it meant. I mean, having litigated... I mean, having granted prosecutorial discretion in my office, I know what it is. And this wasn't it. This was putting him on an order of supervision and then assessing what the removal priorities would be. And when your number comes up, your number comes up. In response to that, and he got an attorney who tried to get a case reopened? Is that what happened? Correct. Correct. And then was that faulty attorney representation or what? I can't say, Your Honor. I can't say, Your Honor. But I can say one thing. The board made it very clear that this was a completely different theory and that Mr. Pinos Gonzalez had made no effort to reconcile these narratives. And in that situation, it was really incumbent upon him to either reconcile the narratives or to file an ineffective assistance of counsel claim. And he didn't do that. And I think it's important to remember that ineffective assistance of counsel in matter of Lozada, I don't think that the board was holding him to the exacting standards of matter of Lozada, but the potential for abuse is apparent when no mechanism exists to allow former counsel whose integrity or competence is being impugned to present their version of the events. And in this situation, counsel has gone from, on the one hand, calling her sloppy in the Mr. Pinos Gonzalez's former counsel, misrepresenting, making outright and affirmative misrepresentations. That's a very serious allegation. And I think what the board was doing was assessing the merits. I don't think fact-finding was really necessary. I think you could look at the face of the record and say, this is a completely different narrative. This is a completely different story. And there's no effort to reconcile them. And yet, at the same time, I don't see an ineffective assistance of counsel claim here. I would also point out that after he lost his appeal in the first motion to reopen in 2015, he said that he went to a second attorney who informed him that his first attorney had not properly handled the case. That would have been the time to file an ineffective assistance of counsel. Your time has expired. Thank you, Your Honors. I greatly appreciate your time. Thank you. Ms. Williams. Your Honors, as I noted previously, this panel is the first group of judges to really take a close look at this case. And when determining whether Nelson, in fact, has demonstrated notice sufficient for reopening, it's important to look at the whole story. Nelson doesn't dispute any of the minute details that opposing counsel has been emphasizing in her argument. Yes, there was an I-130 filed. Yes, there were mistakes made by prior counsel and inconsistencies in the prior filing. That's why it was rejected. Counsel, given that situation, what ability does this panel on appeal have? What ability do we have to reweigh that evidence? Well, essentially, I don't think that this panel should reweigh that evidence. Essentially, the arguments made by counsel focus on these factual questions. What really happened? Should Nelson be believed, given the various pieces of paper and the representations written down? But that's not your task today, to decide what happened. That was what the board should have decided. And that's what the board neglected to decide in its decision on the motion to reopen. Well, to hold in the way you'd like us to hold, what would a one-sentence or one-paragraph, how would you describe a holding in a one-paragraph? Oh. In other words, how would you phrase our holding? I would phrase the holding that the decision of the Board of Immigration Appeals is vacated. Well, that's true. But for what reason? For abuse of discretion. And which was? Which was the failure to apply the proper procedure in place, which allowed him to file a second motion to reopen, challenging lack of notice. That was in the 90s or in the 2000s? That was in the 90s, pre-1997. The board should have applied pre-1997 procedure, which clearly allows Nelson to file a second motion to reopen and be heard on lack of notice, even if he already filed one before. And your closest case in support of that, anything from our court, or would we be reaching, would we be breaking new ground and making bad law? You'd be breaking... Bad in the sense of the word that it might be a precedent that would quickly be overturned by a higher court. So you would be breaking new ground, but it would be good law, because it is essentially... Well, you can say that we're not a court of equity. Right, but it wouldn't be overturned in the sense that the regulations are clear, that he's not number barred from his filing. The decision of the board is clear, that the merits of his filing weren't really fully considered because he didn't separately file a motion. Of course, we're left, or at least I'm left with this question. As the government correctly points out, more gently, what was he doing all these years when he should have followed through and taken advantage of the procedures that were available to him at the time? I'll tell you exactly what he was doing all these years. So until he found out about the deportation order for the first time in 2012, and since that time, he immediately voluntarily submitted himself to ICE supervision, has been under ICE supervision, and has been trying through multiple filings and multiple attorneys... To accept that argument, I would have to say that between the time of 1994 and 2012, he was thought he was home free, for want of a better term. He was oblivious to the reality that he had been ordered deported. Doesn't that strain credulity? As well as trial court level? I honestly don't think it does. I mean, that's your arm, sure. Right, I mean, given the complicated nature of these proceedings and the overwhelmingness of what happened that day. Let's see, what was that 97 law? I can never do the acronym. IRAIRA. Illegal Immigration Reform and Immigrant Responsibility Act of 1996. Well, they certainly gave it a nice sounding name. Well, I don't mean to be foolish, but those of us who are not experts, meaning me, have trouble following it. Right, it is. And I'll just close with this, Your Honor. Counsel, your time has expired. All righty. Thank you, Your Honors. And case number 18-3280 is submitted for decision. Ms. O'Keefe.